UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| SENORA MAPP WILLIAMS, and C.W., a minor, by SENORA MAPP WILLIAMS, his mother and next friend,<br><br>    Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No. 4:12-cv-04107-SLD-JEH |

## ORDER

Plaintiff Senora Mapp Williams, individually and on behalf of her minor son, C.W., alleges in her Complaint that C.W.'s wrist was broken due to the negligence of Defendant United States of America's ("the Government's") employees, who were operating the daycare center at the Rock Island Arsenal on March 15, 2012. Before the Court is the Government's Motion for Summary Judgment, ECF No. 25. For the reasons set forth below, the Motion is GRANTED.

### BACKGROUND[1]

On March 15, 2012, C.W. fell from the bench of a child-sized picnic table onto a cushioned surface at the playground of his daycare center, the Child Development Center ("CDC"), at the Rock Island Arsenal. He was one-and-one-half years old. Williams Dep. 18, ECF No. 27-4. The fall broke his wrist. Williams sued the Government under the Federal Tort

---

[1] Unless otherwise noted, these facts are derived from the Government's Statement of Undisputed Facts, ECF No. 27-1. Pursuant to Local Rule 7.1(D)(2)(6), Williams's failure to respond to the numbered facts may be deemed an admission of those facts. Wherever possible, however, the Court has relied directly on the record evidence provided by the Government—particularly the video recording marked Exhibit 1-C—which Williams incorporated by reference into her Memorandum in Response to the Motion for Summary Judgment, ECF No. 28-1.

1

Claims Act ("FTCA"), 28 U.S.C. § 2675, on November 13, 2012, alleging that the Government was negligent in supervising C.W., failing to have proper policies in place to prevent the fall, and failing to properly train the CDC staff.

At the time of the accident, C.W. was assigned to the Sweet Pea room in Building 16 of the CDC. At 3:30 p.m. on March 15, 2012, he was one of seven children aged 18 to 24 months who were playing outside in a fenced-in playground adjacent to Building 16. Jurisic Dep. 23, Ex. 9, ECF No. 27-4; Rivera Dep. 17, Ex. 10, ECF No. 27-4. Amber Finnesand and Martine Rivera supervised the children. Army Regulation AR 608-10, Chapter 5, Table 5-1, sets the proper ratio for children by age group: for children aged six weeks to twelve months, the ratio is one adult for every four children; for children aged 12 months to 24 months, the ratio is one adult for every five children. Child care staff at the CDC are required to complete twenty-four hours of training each year. The Department of Defense certifies the CDC annually, and the playgrounds are subject to periodic inspections and daily safety checks. Williams does not dispute that the CDC "met the requirements of Federal regulations and that the correct number of workers were present at the facility and on the playground at the time of the accident." Pl.'s Mem. in Resp. Mot. Summ. J. 7.

The CDC was operating in accordance with two relevant Standard Operating Procedures ("SOPs") in March of 2012: Playground Usage and Supervision (SOP 1), and Accident Prevention (SOP 11). Exs. 1-A & 1-B, ECF No. 27-3. Of particular relevance in SOP 1 is the Supervision Model followed by CDC staff, designated by the acronym "PLAY," for proximity, leadership, action, and yielding. Two key excerpts include: "Proximity – Immediate presence through proximate location of an adult can encourage children to follow the rules, promote the

2

intended use of equipment, and facilitate problem solving"; and "Action – Supervision of children at play requires undistracted, active monitoring, or action. Supervisors should be constantly moving around the playground in an unpredictable pattern, while visually scanning other areas for beginnings of problems." SOP 1, ¶ 5.b.

The CDC uses a video monitoring system. More than one camera is trained on the playground where C.W. fell, but the recording of only one angle was preserved as Exhibit 1-C. The timestamp on the video recording is one hour ahead of the actual time; the video starts at 16:25:28, depicting 3:25:28 p.m. on March 15, 2012. The recording shows a rectangular fenced-in lawn with a black, triangular area in the middle. An L-shaped stretch of sidewalk is closest to the camera. Two child-sized picnic tables rest in the center of the black triangle beneath a pavilion. The picnic tables are 20.5 inches high, with seats about 10 inches off the ground. The black triangle is a "fall zone," made of a special poured-in-place playground safety surface (about 3.5 inches of recycled rubber). According to the Government's expert, Nancy Carlson, the material is designed to disperse the momentum of a body falling up to eight feet. Carlson Letter, Ex. 2, ECF No. 27-3. The picnic tables are meant to allow indoor activities to be brought outside; they are not designed for climbing. The playground also contains riding toys and small play structures. C.W. is wearing white or light gray sweat pants with a black stripe running down the leg and a dark shirt.

On the tape, C.W. falls and hits the safety surface at 16:32:27. Rivera is seen blowing bubbles in the foreground at 16:25:49 before moving off screen at 16:25:56. Rivera states that from about 16:27:30 until 16:32:26, she believes she was about twenty feet from the picnic tables, standing next to a fence with a child. Rivera Dep. 29–37. She admits that she was

engaged in casual conversation about the child with a coworker from Building 15, but says that she was positioned in a way that she "would still see what was going on." *Id.* at 30, 32. Williams, in her deposition, states that she viewed a ten- to thirty-second clip of a recording from another camera angle, which showed Rivera at the time of the accident. Williams Dep. 31–38. According to Williams, Rivera's "back was turned" and she was facing an adult; "she was at the gate . . . I think [she] had one child with her." *Id.* at 36–37. Rivera admits that her attention was not toward the picnic tables at 16:32, and that she did not witness the fall. Rivera Dep. 36.

      Finnesand is visible in the recording throughout the relevant time. At 16:30:27, C.W. and a boy in a white shirt are sitting or kneeling on the bench of a picnic table while Finnesand observes from a short distance. Another child appears to seek Finnesand's attention, before running away, as she walks toward a fourth. At 16:30:46, Finnesand picks up another child in the far left of the visual field. The two children at the picnic table climb up and lay on their stomachs on top of the table at 16:30:55, as Finnesand walks back toward them with the child she just retrieved. Finnesand sets that child down at 16:31:07 near the picnic tables. The two children on the picnic table are joined by a third child, and at 16:31:15, they move into a seated position on top of the table. At 16:31:19, Finnesand begins to physically remove the three children from the table top. According to Finnesand, she redirected them and said, "feet on the ground." Finnesand Dep. 18, 27–28, Ex. 8, ECF No. 27-4. When all three are on or below-bench level, at16:31:43, Finnesand appears to be speaking with the children.

      At 16:31:51, as Finnesand walks around the picnic table, the boy in the white shirt climbs back onto the table top, and stands up at 16:31:54. Finnesand lifts him off the table and into her arms before setting him on the ground. He runs away at 16:32:01, and returns to duck beneath

4

the table at 16:32:06.  Finnesand turns her attention to two other children near the tables, who she says both wanted the same riding toy.  Finnesand Dep. at 29.  C.W. is sitting or kneeling on the bench of the picnic table.  At 16:32:10.70, Finnesand holds the hand of one of the riding-toy children; she looks at C.W. and the boy in the white shirt, and starts to walk away with the riding-toy child.  She does not turn her gaze away from C.W. and the boy in the white shirt until 16:32:13, and she looks back in their direction at 16:32:14 for at least one second.  The children at the picnic table have not moved; C.W. is sitting or kneeling on the bench, and the boy in the white shirt is beneath the table.  At 16:32:20, the boy in the white shirt crawls out from under the table, and climbs to its top by 16:32:25.  Finnesand is visible in the far left of the visual field with the riding-toy child; she faces away from the picnic tables.  C.W. appears to suddenly lose his balance at 16:32:26 and hits the safety surface by 16:32:27.  It is not clear from the recording whether, as the Government posits, C.W. is kneeling on the bench of the table when he falls, but it is clear that he is not on top of the table.  Finnesand turns to look in C.W.'s direction at 16:32:28.  Williams does not take issue with the attention or care paid to C.W. after the accident.  Williams Dep. at 41.  C.W.'s wrist was broken, but he sustained no permanent damage to his wrist.  *Id.* at 26.  Williams states that he appears more fearful; she made an appointment to take him to a counselor, but C.W. had not yet seen one at the time of her deposition.  *Id.* at 28.

## DISCUSSION

I. **Legal Framework**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the Court will construe all facts and draw all

reasonable inferences in favor of the nonmoving party. *See Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 948 (7th Cir. 2009). Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted). A court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). There can be no genuine issue as to any material fact when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party may not rest on its pleadings. *See id.* at 324 (explaining the purpose of Fed. R. Civ. P. 56(e)).

The FTCA permits tort claims against the United States by parties injured by allegedly negligent acts or omissions of any government employee acting within the scope of his or her official duties. *LM ex rel. KM v. United States*, 344 F.3d 695, 698 (7th Cir. 2003) (citing 28 U.S.C. § 1346(b)). FTCA suits are governed by the substantive law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1). To prove negligence in Illinois, a plaintiff must prove by a preponderance of the evidence that: (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused the plaintiff's

6

injury.  *Chandler v. Ill. Cent. R.R. Co.*, 798 N.E.2d 724, 728 (Ill. 2003).  Whether a duty is owed is a matter of law, while the questions of breach and proximate cause are generally for the finder of fact—provided there is a genuine issue of material fact as to those elements.  *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1054 (Ill. 2006).  The mere fact of an accident does not raise a presumption that a defendant was negligent.  *Long v. Ill. Power Co.*, 543 N.E.2d 525 (Ill. App. Ct. 1989).

Here, the parties agree that the CDC owed a duty of care to supervise the children on the playground, to maintain adequate policies to prevent accidents, and to properly train its employees.  They also agree that the standard of care owed by CDC staff to C.W. was one of "ordinary care."  *See* Mem. in Supp. Mot. Summ. J. 5, ECF No. 27; Mem. in Resp. Mot. Summ. J. 2–3, ECF No. 28-1.  In other words, they agree that the defendant owed a duty "to act as would an 'ordinary careful person' or a 'reasonably prudent' person" under the circumstances.  *Jones v. Chicago HMO Ltd. of Ill.*, 730 N.E.2d 1119, 1130 (Ill. 2000).  The parties disagree as to whether that duty was breached and, if so, whether the breach proximately caused C.W.'s injuries.  A breach is simply a failure to uphold one's duty.

In Illinois, proximate cause is established when the injury is "the natural and probable result of the negligent act or omission and [is] of such a character as an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence."  *Williams v. Univ. of Chi. Hosps.*, 688 N.E.2d 130, 134 (Ill. 1997) (quoting *Neering v. Ill. Cent. R.R. Co.*, 50 N.E.2d 497, 503 (Ill. 1943)).  The negligent party need not foresee the precise injury that results.  *Id.* (citing *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 493 N.E.2d 1022, 1029 (Ill. 1986)).  Proximate cause consists of both "cause in fact" and "legal cause."  *Thacker v. UNR Indus., Inc.*, 603

N.E.2d 449, 455 (Ill. 1992). "Legal cause" is concerned with the foreseeability of an injury, and is found where the injury is "of a type which a reasonable man would see as a likely result of his conduct." *Donaldson v. Cent. Ill. Pub. Serv. Co.*, 767 N.E.2d 314, 331 (Ill. 2002), *abrogated on other grounds by In re Commitment of Simons*, 821 N.E.2d 1184 (2004). "Cause in fact" may result from either of two theories: the traditional "but for" theory or the "substantial factor" theory. *Thacker*, 603 N.E.2d at 455. A defendant's conduct is not the "but for" cause of an event if the event would have occurred without it. *Id.* The defendant's conduct is a "substantial factor" if it is "somehow 'responsible' for producing the injury at issue." *Id.* "Illinois courts have, as a matter of law, refused to allow a plaintiff to take the causation question to the jury when there is insufficient evidence for the jury to reasonably find that the defendant's conduct was a cause of the plaintiff's harm or injury." *Id.* "[M]ere conjecture or speculation is insufficient" proof of causation. *Id.* at 454.

## II.     Analysis

As the Government notes in its Reply, Williams does not argue against summary judgment on her negligent training or inadequate policy claims, and she offers no evidence in support of those claims. Because Williams thereby "fails to make a showing sufficient to establish the existence of an element essential to that party's case," on which she will bear the burden of proof at trial, there is no genuine issue as to any material fact on those claims, and the Government is entitled to summary judgment on the claims as a matter of law. *See Celotex*, 477 U.S. at 322.

As to the remaining claim of negligent supervision, Williams argues that the duty of ordinary care was breached in this case because "closer monitoring of the children in the vicinity

8

of the table, including [C.W.], was the appropriate conduct in light of all of the circumstances." Mem. in Resp. Mot. Summ. J. 7. She does not explicitly define how the "closer monitoring" ought to look. She does, however, repeatedly point to the fact that neither Finnesand nor Rivera were looking at C.W. when he fell. *See, e.g.*, *id.* at 5 ("A trier of fact could conclude that socializing with a person with one's back turned to a playground with seven (7) rambunctious children while the only other worker present is preoccupied with one toddler creates an unreasonably dangerous condition and is negligent."). But Williams offers no support for the contention that a pair of eyes must be on each child at all times. Moreover, such a standard of care is not realistic in a group childcare setting where the ratio of children to adults is seven to two. That, for short periods, both adults may be turned away from one of the children is not unreasonable. This conclusion is logically compelled by the ratio—each adult's attention will necessarily be divided among multiple children, and if two children were to require individual attention simultaneously, the adults' monitoring of the other five would be momentarily reduced. Thus, no reasonable trier of fact could find that the mere fact that neither Finnesand nor Rivera were looking at C.W. for a period of (at most) thirteen seconds constitutes a breach.

Taking Finnesand and Rivera's conduct individually paints a more complex picture. Construing all facts and drawing all reasonable inferences in Williams's favor, the undisputed evidence shows that Finnesand acted as a reasonably prudent person would in light of all of the circumstances, and therefore did not breach her duty in supervising C.W. When the children climbed on the picnic table, Finnesand actively intervened through physical removal and verbal redirection. When the boy in the white shirt climbed up a second time, she again intervened. Her attention was primarily focused on the picnic tables for over a minute, and she did not turn

9

away until C.W. and the boy in white had been behaving appropriately at the picnic table for ten seconds. Thus, it is not reasonable to infer, as Williams urges, that Finnesand diverted her attention while "two rambuctions boy toddlers were engaging in [the] dangerous activity of climbing onto objects." It was reasonable both for Finnesand to perceive the climbing situation as under control, and to act accordingly by turning her attention to a conflict between two other children, especially since she stayed in relatively close proximity to the picnic tables as she assisted another child.

It is undisputed that Rivera's attention was not focused on C.W. at the time he fell. The only factual dispute in this case concerns her conduct: while she stood by the fence with a child, she was either partially or fully distracted by her conversation with a co-worker. For purposes of this Motion, the Court construes the facts and draws all reasonable inferences in Williams's favor. In so doing, the Court concludes that the evidence is sufficient to support a trier of fact's finding of breach. While the PLAY model of supervision described in the CDC's SOP 1 is not determinative of what constitutes "ordinary care," it is significant that Rivera's conduct appears inconsistent with it—for example, the record does not provide a basis to find that she was "constantly moving around the playground in an unpredictable pattern." She had a child with her as she spoke with a co-worker, but under Williams's account of the events, Rivera's back was turned to an area of the playground for at least ten to thirty seconds. Therefore, a trier of fact could reasonably find that Rivera's conduct did not comport with that of a reasonably prudent person under the circumstances.

Even so, no trier of fact could find, based on the record evidence, that Rivera's possible breach proximately caused C.W.'s injury. If Rivera had been visually scanning the entire

playground, she would have seen that Finnesand was appropriately supervising the picnic table area for the vast majority of the time at issue. And, as explained above, a reasonably prudent person under the circumstances would have perceived the climbing situation as diffused when Finnesand started to assist the riding-toy child. Even if Rivera had seen the boy in the white shirt climb atop the table for a third time, moreover, it is highly improbable that she could have intervened within the six-second window before C.W.'s fall. If she had taken action, it is even more unlikely that it would have been as to C.W. After all, the boy in the white shirt climbed all the way onto the tabletop—C.W. had not.

Williams does not suggest that Rivera's distraction was the but-for cause of C.W.'s injury, and she points to no evidence that suggests it was a substantial factor. Mere speculation or conjecture as to what could have happened does not suffice. *See, e.g.*, Mem. in Resp. Mot. Summ. J. 6 ("[Finnesand] could have called her co-worker Martine Rivera to assist in finding a toy for the toddler she was dealing with or asked Martine to stay with the boys at the table while she got a toy for the other toddler."); *see also Thacker*, 603 N.E.2d at 454. Williams points to no evidence that could convince a trier of fact that C.W.'s broken wrist was "the natural and probable result" of Rivera's distraction. *See Williams*, 688 N.E.2d at 134. Therefore, the Government is entitled to summary judgment on Williams's negligent supervision claim.

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment, ECF No. 25. The Clerk is directed to enter judgment, closing the case.

Entered this 8th day of September, 2014.

s/Sara Darrow
                                    SARA DARROW
                                    UNITED STATES DISTRICT JUDGE